**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| IGNIS INNOVATIONS DISPLAY PANELS LLC,<br><br>               Plaintiff,<br><br>    v.<br><br>BOE TECHNOLOGY GROUP CO., LTD.,<br><br>              Defendant. | CIVIL ACTION NO. <u>2:26-cv-103</u><br><br>**JURY TRIAL DEMANDED** |

## IGNIS INNOVATIONS DISPLAY PANELS LLC'S COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff IGNIS Innovations Display Panels LLC files this complaint for patent infringement against Defendant BOE Technology Group Co., Ltd., and alleges, with personal knowledge as to its own actions and on information and belief as to the actions of others, as follows:

### INTRODUCTION

1.      This is an action for patent infringement under the patent laws of the United States, 35 U.S.C. § 1 *et seq.* Plaintiff alleges that Defendant has infringed and continues to infringe, directly and indirectly, six patents: U.S. Patent Nos. 7,948,170, 8,188,946, 8,552,636, 9,867,257, 10,453,397, and 10,586,491 (collectively, the "Asserted Patents").

2.      The Asserted Patents describe novel technologies that are used in modern display panels, including organic light emitting diode ("OLED") displays and active matrix organic light emitting diode ("AMOLED") displays.

3.      Defendant BOE Technology Group Co., Ltd., has infringed and continues to infringe the Asserted Patents, directly and indirectly, by (1) making, using, offering to sell, selling,

and/or importing into the United States infringing display products that practice the claimed inventions of the Asserted Patents; (2) inducing third parties (e.g., BOE customers, including Apple, Inc., and end users) to make, use, offer to sell, sell and/or import into the United States BOE products (e.g., OLED display products) that include the claimed inventions of the Asserted Patents, with knowledge of the Asserted Patents and with specific intent to cause the third parties' infringement; and (3) contributing to third parties' (e.g., BOE customers and end users) direct infringement of the Asserted Patents by offering to sell, selling, and/or importing into the United States components of patented devices, which constitute a material part of the claimed inventions, with knowledge of the Asserted Patents and of the third parties' infringement.

4.      Plaintiff seeks damages and other relief for Defendant's infringement of the Asserted Patents.

## THE PARTIES

5.      Plaintiff IGNIS Innovations Display Panels LLC ("IGNIS") is a corporation organized and existing under the laws of the United States with a place of business at 5700 Tennyson Parkway, Plano, Texas 75024.

6.      Defendant BOE Technology Group Co., Ltd. ("BOE") is a corporation organized and existing under the laws of China with a registered address at 10 Jiuxianqiao Road, Chaoyang District, Beijing, 100015, P.R. China, and a principal place of business at No. 12 Xihuanzhong, RD, BDA, Beijing, 100176, P.R. China.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the action brought by IGNIS against BOE arises under the patent laws of the United States, 35 U.S.C. §1 *et seq*.

8.      This Court may exercise general and specific personal jurisdiction over BOE consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute. BOE has intentionally manufactured and/or distributed OLED display products that infringe the Asserted Patents, and/or caused its subsidiaries, affiliates, or intermediaries to manufacture and/or distribute infringing OLED display products, through established distribution channels, intending that those products be sold in the United States, the State of Texas, and this District. BOE holds itself and its subsidiaries out as a single global entity serving the United States. For example, according to BOE, "one out of every four display products in the world come[s] from BOE" and its display products are intended to be sold and used "abroad."[1] BOE has also touted itself as a "global leader in the . . . manufacture of semiconductor displays and a technological pioneer in the field of organic light emitting diode (OLED) displays."[2]

9.      Furthermore, BOE has (itself and/or through subsidiaries, affiliates, or intermediaries) committed acts of patent infringement in the United States, the State of Texas, and this District, including by making, using, offering to sell, and/or selling infringing OLED display products in the United States, the State of Texas, and this District and/or inducing others to commit acts of patent infringement and/or contributing to the direct infringement of others in the United States, the State of Texas, and this District.

10.     BOE knows or should reasonably expect that the Accused Products, including the OLED displays described *infra*, are incorporated in finished consumer products sold in the United States, including in Texas (the state with the second-highest population) and this District. BOE further knows or should reasonably expect that these finished consumer products, such as Apple

---

[1] *About Us*, BOE, https://www.boe.com/en/about/index (last visited Feb. 11, 2026).
[2] Dkt. No. 1, at ¶ 1, *BOE Technology Group Co., Ltd., et al. v. Samsung Display Co., Ltd.*, No. 2:25-cv-00587 (E.D. Tex.) (May 27, 2025).

smartphones and other end-user devices identified and described *infra*, are sold in numerous retail locations throughout the United States, including in Texas and in this District. BOE also knows or should reasonably expect that finished consumer products incorporating the Accused Products are sold through websites controlled by U.S. companies, such as Apple, and are available to U.S. consumers, including in Texas and this District.

11.     BOE has also purposely availed itself of the laws and protections of the United States, the State of Texas, and this District by filing claims and counterclaims in this District. *See, e.g.*, Dkt. No. 1, *BOE Technology Grp. Co., Ltd., et al. v. Samsung Display Co., Ltd.*, No. 2:25-cv-00587 (E.D. Tex. May 27, 2025); Dkt. No. 58, *Longitude Licensing Ltd. v. BOE Technology Grp. Co., Ltd.*, Case No. 2:23-cv-00515 (E.D. Tex. Jun. 13, 2024).

12.     Accordingly, BOE has established minimum contacts within the forum and purposefully availed itself of the benefits of Texas, such that the exercise of personal jurisdiction over BOE would not offend traditional notions of fair play and substantial justice. In addition, or in the alternative, this Court has personal jurisdiction over BOE pursuant to Federal Rule of Civil Procedure 4(k)(2).

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c)(3) because BOE is a foreign entity and may be sued in any judicial district in the United States.

14.     BOE did not move to transfer prior cases filed in this District, including but not limited to *Element Capital Commercial Company Pte. Ltd v. BOE Technology Grp. Co., et al.*, Case No. 2:22-cv-00118-JRG (E.D. Tex.), and *Vista Peak Ventures, LLC v. BOE Technology Grp. Co., Ltd.*, Case No. 2:18-cv-00431-JRG (E.D. Tex.).

## THE ASSERTED PATENTS

15.     The Asserted Patents are directed to improvements in display technology, including OLED and AMOLED display products and technologies. Common OLED applications and products today include smartphones, tablets, TVs, monitors, smartwatches, and many other modern electronic devices. OLED displays, including AMOLED, are praised for their vibrant colors, deep blacks, and flexibility.

16.     OLED stands for Organic Light Emitting Diode, a display technology that uses organic compounds to emit light when an electric current is applied. Each pixel in an OLED display is self-emissive, meaning it generates its own light, unlike LCDs which require a backlight. This generally allows OLED displays to achieve deeper blacks, higher contrast ratios, and more vibrant colors.

17.     Active-Matrix OLED, or AMOLED, is a type of OLED that uses an active-matrix system (typically with thin film transistors, or TFTs) to control individual pixels. AMOLED is a subset of OLED technology.

18.     United States Patent No. 7,948,170 ("the '170 Patent"), titled "Pixel Having an Organic Light Emitting Diode and Method of Fabricating the Pixel," generally relates to the design and fabrication of a pixel architecture incorporating an OLED with a thin film transistor backplane. A true and correct copy of the '170 Patent is attached as Exhibit 1.

19.     United States Patent No. 8,188,946 ("the '946 Patent"), titled "Compensation Technique for Luminance Degradation in Electro-luminance Devices," generally relates to techniques for dynamically providing constant brightness with high accuracy and reducing the effect of the aging of the pixel circuit in an OLED system. A true and correct copy of the '946 Patent is attached as Exhibit 2.

20.     United States Patent No. 8,552,636 ("the '636 Patent"), titled "High Resolution Pixel Architecture," generally relates to a high resolution pixel using OLEDs in an arrangement for improving parameters such as aperture ratio. A true and correct copy of the '636 Patent is attached as Exhibit 3.

21.     United States Patent No. 9,867,257 ("the '257 Patent"), titled "System and Driving Method for Light Emitting Device Display," generally relates to a pixel circuit and driving method in displays, such as OLEDs, to compensate for spatial and temporal non-uniformities in order to enhance display performance. A true and correct copy of the '257 Patent is attached as Exhibit 4.

22.     United States Patent No. 10,453,397 ("the '397 Patent"), titled "Stable Driving Scheme for Active Matrix Displays," generally relates to techniques compensating for pixel aging and non-uniformities by implementing a driving scheme that includes, for example, different cycles. A true and correct copy of the '397 Patent is attached as Exhibit 5.

23.     United States Patent No. 10,586,491 ("the '491 Patent"), titled "Pixel Circuits for Mitigation of Hysteresis," generally relates to pixel circuits and driving methods for AMOLED and other emissive displays that improve the current-voltage response and display performance by reducing short-term hysteresis effects. A true and correct copy of the '491 Patent is attached as Exhibit 6.

24.     The Asserted Patents are not directed to an abstract idea because they solve technical challenges in the field of display technology, including OLED and AMOLED displays. OLED applications face several problems that can impact performance and longevity. One issue is "burn-in," where the prolonged display of static images causes irreversible degradation of OLED materials, leading to permanent image retention on a screen. OLED pixels can also age unevenly over time due to variations in usage and material properties, causing non-uniformity in brightness

and color across the display. Another challenge is that the thin film transistors in an AMOLED display can exhibit hysteresis, where the current-voltage (I-V) response depends on prior electrical states, resulting in imprecise control of pixel brightness. This hysteresis can produce short-term image artifacts that compromise image quality and viewer experience.

25.    The Asserted Patents address these constraints, along with other challenges, by using novel technologies grounded in advanced pixel circuits and driving schemes, thereby improving display performance and longevity.

26.    Moreover, the Asserted Patents contain inventive concepts, as they claim techniques, technologies, systems, and approaches that were not well-understood, routine, or conventional. For example:

    a.    The '170 Patent describes a vertically integrated pixel architecture that uses a configuration of a thin film transistor (TFT)-based backplane, organic light emitting device, planarization dielectric layer, first via, and additional dielectric layer. This pixel architecture offers several advantages in OLED displays, including for example, enabling a TFT backplane suitable for OLED fabrication and achieving higher aperture rates and yield rates.

    b.    The '946 Patent describes a pixel circuit for compensating luminance degradation in OLEDs using a configuration of a light emitting device, storage capacitor, and multiple transistors to enable programming, pre-charge, compensation, and driving cycles. This pixel circuit offers several advantages in OLED displays, including for example, providing enhanced brightness stability despite aging or process variations and improving the display operating lifetime.

c. The '636 Patent describes a high-resolution pixel that includes a staggered arrangement of OLEDs to increase aperture ratios. This configuration reduces the distance between OLEDs and minimizes the blocked area of OLED emission surfaces, leading to several advantages in OLED displays, including for example, larger emission areas and larger aperture ratios.

d. The '257 Patent describes a pixel circuit that enables a current-biased voltage-programmed (CBVP) driving scheme that includes a configuration of a driving transistor, a first switch transistor, a second switch transistor, and an emission control transistor. This configuration offers several advantages in OLED displays, including for example, improving display performance, operating lifetime, and fabrication costs.

e. The '397 Patent describes a display system using a driving scheme for pixel circuits that includes selecting a first operation cycle for a first pixel circuit and a second operation cycle for a second pixel circuit. This approach offers several advantages in OLED displays, including for example, reducing stress on drive transistors and light emitting devices while improving display longevity and performance.

f. The '491 Patent describes a display system that incorporates a controller for driving pixel circuits during multiple operation cycles, including a reset cycle prior to a programming cycle in which a reset switch transistor is activated to expose a common node of the pixel circuit to the reference potential. This approach offers several advantages in OLED displays, including for example, mitigating short-term hysteresis effects in the current-voltage response, while improving pixel brightness accuracy and display performance.

27.    Accordingly, the Asserted Patents are directed to patent-eligible subject matter and are valid and enforceable.

## THE ACCUSED PRODUCTS

28.    The Accused Products are OLED displays used, made, sold, offered for sale, or imported, directly or indirectly, by BOE, including OLED displays incorporated by BOE's third-party customers into smartphones, tablet PCs, laptops, monitors, TVs, smartwatches, vehicles, and other end-user devices ("Accused Products").

29.    By way of example and not limitation, the Accused Products include BOE's OLED displays that are incorporated into various models, sizes, and variants of the following end-user devices: iPhone 13, iPhone 14, iPhone 15, iPhone 15 Plus, iPhone 16, iPhone 16 Plus, iPhone 16e, OnePlus 12, OnePlus 13, Nubia Red Magic 9 Pro, and Nubia Red Magic 10 Pro.[3]

30.    BOE imports, offers to sell, and sells Accused Products in the United States and provides Accused Products to third parties for sale in the United States as part of third-party devices, and BOE actively targets the U.S. market for sales of the Accused Products. For example, BOE sells Accused Products to customers for incorporation into electronic devices, and those sales occur in the United States. For example, BOE is identified on Apple's Supplier List,[4] industry market reports confirm that BOE supplies OLED displays for use in Apple iPhone models sold in the United States,[5] and BOE itself has publicly confirmed its role as an OLED supplier to Apple.[6]

---

[3] Discovery may reveal the existence of additional infringing products or end-user devices.

[4] Apple, Inc., Supplier List (2024), https://www.supplychainreports.apple/files/doc_downloads/2024/04/Apple-Supplier-List.pdf (last visited Feb. 11, 2026).

[5] *See, e.g.*, *The iPhone OLED Supply Chain in 2022*, OMDIA (June 23, 2022), https://omdia.tech.informa.com/blogs/2022/jun/the-iphone-oled-supply-chain-in-2022 (last visited Feb. 11, 2026).

[6] *BOE Release New Q9 OLED Materials at Innovative Technology Conference*, BOE, https://boe-us.com/news/boe-innovative-technology-conference (last visited Feb. 11, 2026).

## FACTUAL BACKGROUND

**I.    Ignis Innovation's Efforts to Commercialize the Patented Inventions**

31.    Ignis Innovation Inc. ("Ignis Innovation") is a Canadian company specializing in advanced pixel circuit and compensation technologies for OLED and AMOLED displays. The company was founded by Dr. Arokia Nathan, a distinguished researcher and former professor, as part of efforts to commercialize groundbreaking pixel circuit research for AMOLED backplanes that originated at the University of Waterloo in Canada.

32.    Dr. Nathan's research group, later advanced by his Ph.D. student Gholamreza (Reza) Chaji, focused on overcoming core challenges in AMOLED backplanes and other OLED components, including non-uniformity, image retention, and burn-in effects. The team adopted a multidisciplinary strategy that combined materials science and circuit design.

33.    In the early 2000s, the company concentrated on developing compensation and driving schemes to overcome AMOLED display limitations. In contrast to expensive and complex material-based solutions, Ignis Innovation pursued circuit and algorithm-driven solutions that proved far more cost-effective and easier to incorporate into standard manufacturing flows.

34.    During this time, Ignis Innovation created its foundational Intelligent Pixel technology, a comprehensive suite of pixel circuit designs and driving methods designed to enhance AMOLED backplane performance. This technology focused on compensating for non-uniformities in TFTs and OLED materials, addressing critical issues like threshold voltage ($V_{th}$) variation, mobility differences, and pixel aging.

35.    In 2007, Ignis Innovation secured major investments that enabled the company to scale its research and development efforts and broaden its commercial reach. Thereafter, it developed several commercial technologies, including the high-performance MaxLife™ platform.

36.     MaxLife™ technology represents a powerful enhancement to the Intelligent Pixel platform. It corrects non-uniformity and aging issues in AMOLED backplanes caused by both OLED material degradation and TFT effects. By combining drive circuitry, measurement systems, and proprietary algorithms, MaxLife™ compensates for pixel degradation and delivers stable brightness and color performance over the life of the display.

37.     MaxLife™ substantially reduced burn-in and non-uniformity, thereby enabling superior AMOLED displays for demanding applications including smartphones, TVs, and automotive panels. Demonstrations on commercial devices such as the Google Pixel 2 and Samsung Galaxy S6 showed MaxLife™'s ability to eliminate visible burn-in artifacts (e.g., persistent squares or logos) when activated.

38.     Ignis Innovation later developed MaxLife™ Lite, a streamlined variant of the MaxLife™ technology. Designed for high manufacturing yield and low cost, MaxLife™ Lite enabled display manufacturers to rapidly scale AMOLED production without sacrificing high performance or longevity.

39.     In 2013, Ignis Innovation began shipping 55-inch AMOLED MaxLife™ prototype samples to prospective customers, showcasing the technology's scalability for large-screen applications such as TVs. These prototypes achieved 20% lower power consumption and significantly longer operating lifetimes than competing OLED TVs from LG and Samsung.

40.     Ignis Innovation also developed a driver chip that senses the performance of individual pixels on AMOLED panels, which was integrated into its external compensation system. This chip was deployed in medium-sized panels for IT and automotive applications. By providing real-time, pixel-by-pixel level measurement of OLED and TFT characteristics, the technology delivered precise compensation for aging and non-uniformity. This capability delivered marked

improvements in display lifetime and performance, particularly in demanding applications where reliability is critical, such as automotive dashboards.

41.    In June 2016, Ignis Innovation signed a non-exclusive patent license agreement with LG Display Co., Ltd., a global leader in OLED display manufacturing. This agreement granted LG access to Ignis Innovation's circuit technology to enhance the performance of its OLED displays.

42.    Ignis Innovation and its personnel have been recognized as leaders in OLED and AMOLED display technology for decades. For example, Ignis Innovation's founder, Dr. Nathan, received the 2020 IEEE EDS J.J. Ebers Award in recognition of his contributions to AMOLED technology. This award underscores the technical excellence of Ignis Innovation and its pioneering research at the University of Waterloo, along with its lasting worldwide influence on emissive display technology.

43.    The United States Patent and Trademark Office ("USPTO") has issued hundreds of patents to Ignis Innovation in recognition of its groundbreaking inventions, including the Asserted Patents. Ignis Innovation has built one of the largest intellectual property portfolios in the display technology industry. These patented innovations have solved critical technical challenges, enabled advancements such as high dynamic range (HDR) displays, and achieved lower power consumption, reduced burn-in, and longer lifetimes in OLED-based products.

## II.    BOE's Display Devices Business and Targeting of the U.S. Market

44.    BOE is a Chinese multinational corporation and one of the world's leading manufacturers of semiconductor display products. According to BOE's annual reports, its Display Devices business is the company's single largest revenue-generating segment, accounting for more than 83% of BOE's total operating revenue in both 2023 and 2024. BOE has repeatedly held itself

out as a global leader in the semiconductor display industry. Its 2022 annual report stated that BOE's semiconductor display products ranked first worldwide in shipment volume.

45.    BOE's Display Devices business provides OLED displays, among other display products, to third parties that then incorporate BOE's products into finished devices for end users. BOE's 2022 annual report refers to these third parties as its "brand customers."

46.    BOE targets the United States market for its sales of display products. According to BOE's 2022 annual report, approximately 20% of its 2022 operating revenue came from its "America" operating segment, which includes the United States. That same report also notes that BOE ranked eleventh worldwide among entities with the most U.S. patents granted, and that it was among the global top 20 U.S. patent grantees for five consecutive years. BOE has stated that it obtains U.S. patents to protect the U.S. market for its products. In January 2017, Li Xinguo, BOE's Vice President and Director of BOE's Intellectual Property and Technology Management Center, stated regarding BOE's inclusion among the top 50 entities receiving patent assignments from the USPTO: "In the past, BOE applied for patents mainly to protect our products. Now, we also seek to increase the market shares of our products."[7]

47.    BOE targets the U.S. market for its display products through subsidiaries under the common ownership of BOE, including its U.S.-based subsidiary, BOE Technology America, Inc. ("BOE America"). At BOE's direction and control, BOE America participates in and facilitates the supply of BOE's display products to the U.S. market.[8] These activities include strategic brand

---

[7] *BOE ranked 40th in the Top 50 USPTO Patent Assignees in 2016*, BOE, https://www.boe.com/en/company/dynamic-891ce385fc934f698f223a3072960c7e, (last visited Feb. 11, 2026).
[8] *See, e.g.*, *FAQ*, BOE, https://boe-us.com/faq (last visited Feb. 11, 2026) ("BOE America serves as a liaison between customers in the US and BOE's R&D, production, commercial teams in Asia.").

customer development, support services for BOE's existing U.S.-based customers, promoting and marketing BOE's display products, and participating at conferences and events on behalf of BOE. For example, BOE America's website boasts that BOE ranked second in the worldwide market for OLED manufacturing in 2022 and touts its role as Apple's OLED supplier.[9] BOE's global website states that BOE America currently has three offices in the United States.

48.    BOE America is an extension of BOE, controlled by BOE, and under common ownership with BOE. According to BOE America's corporate filings, its officers and directors are also high-level BOE employees, indicating that BOE America exists for the purpose of serving BOE's market in the United States.

49.    BOE has also imported Accused Products into the United States, and used them in the United States, to promote them at industry and trade shows. For example, BOE imported OLED devices into the United States for exhibition at trade shows, such as the Consumer Electronics Show (CES) and the Society for Information Display's (SID) DisplayWeek events, including as recently as 2026.[10]

50.    Accordingly, BOE (directly and/or through subsidiaries, affiliates, or intermediaries) has imported, offered to sell, and sold, infringing OLED displays in the United States through established distribution channels, and continues to engage in these acts. BOE purposefully places its infringing products into the stream of commerce through established

---

[9] *BOE Release New Q9 OLED Materials at Innovative Technology Conference*, BOE, https://boe-us.com/news/boe-innovative-technology-conference (last visited Feb. 11, 2026).
[10] *See, e.g.*, *BOE at CES 2026: Where Displays Meet the Future*, BOE, https://boe-us.com/news/boe-ces-2026 (last visited Feb. 11, 2026); *The Future of OLED at Display Week 2025*, OLED-INFO, https://www.oled-info.com/future-oled-display-week-2025 (last visited Feb. 11, 2026) ("All the major display providers will be there, including AUO, BOE . . . .").

distribution channels with the expectation or knowledge that they will be purchased by consumers in the United States, the State of Texas, and this District.[11]

## III.    BOE's Knowledge of Ignis Innovation's Patents

51.    BOE began evaluating Ignis Innovation's technologies for potential use in its display products as early as 2014. From 2014 through 2016, representatives from BOE and Ignis Innovation held multiple discussions to explore potential business opportunities involving OLED technology. During this period, for example, Ignis Innovation provided BOE with several 55-inch AMOLED prototype display panels to showcase Ignis Innovation's OLED capabilities, including MaxLife™ and related advancements in OLED technology.

52.    By 2017, BOE had commenced production of AMOLED displays at scale, despite its previous focus on LCD displays. On information and belief, BOE reviewed the Asserted Patents during this timeframe and began to incorporate Ignis Innovation's inventions into BOE's OLED displays without permission or license.

53.    Based on this previous course of dealings between the parties, BOE knew that its OLED displays infringed the Asserted Patents or, alternatively, believed there was a high probability that its OLED displays infringed the Asserted Patents, but took deliberate action to avoid learning that fact. Yet BOE continued to practice the Asserted Patents without permission or license even though it knew, or in the alternative at least should have known, of that infringing conduct.

---

[11] *See, e.g.*, in its February 28, 2023 motion to intervene as a respondent in the -1351 ITC Investigation, a BOE subsidiary admitted that it "manufactures and sells AMOLED screens to" other entities, and that "some of those screens are thereafter imported into the United States." Ex. 13 at 6. Thus, BOE was by its own admission aware that its infringing OLED displays would be imported by its customers into the U.S. (and that its customers' downstream products would infringe via their use of the infringing OLED displays), yet it has sold those displays to those customers anyway.

## COUNT I: INFRINGEMENT OF THE '170 PATENT

54.     IGNIS incorporates by reference the preceding paragraphs as if fully set forth herein.

55.     United States Patent No. 7,948,170 ("the '170 Patent"), titled "Pixel Having an Organic Light Emitting Diode and Method of Fabricating the Pixel," was legally and duly issued on May 24, 2011. *See* Exhibit 1.

56.     IGNIS owns all rights, title, and interest in the '170 Patent, and holds all substantial rights pertinent to this suit, including the right to sue and recover for all past, current, and future infringement.

57.     IGNIS has complied with all statutory requirements to pursue and recover for any infringement of the '170 Patent. The notice provisions of 35 U.S.C. § 287 do not apply in this case for the '170 Patent, and therefore IGNIS has satisfied its obligations under 35 U.S.C. § 287 with respect to the '170 Patent.

58.     BOE has infringed literally, and/or under the doctrine of equivalents, at least one claim of the '170 Patent. For example, the Accused Products are manufactured by a process that meets every limitation of at least claim 18 of the '170 Patent. Claim 18 of the '170 Patent recites:

> **18.** A method of fabricating a display that includes multiple pixels each of which has a vertical architecture in which a thin film transistor (TFT)-based backplane and an organic light emitting device (OLED) are formed on the same substrate, the method comprising:
>
> forming a TFT based backplane including a gate, source, and drain nodes on a substrate having a substantially flat upper surface, the TFT-based backplane having a vertical profile facing away from the upper surface of the substrate;
>
> forming a planarization dielectric layer on top of said TFT based backplane, the planarization layer having a smooth, planarized upper surface for planarizing the vertical profile on the TFT based backplane;
>
> forming a first via in the planarization dielectric layer, such that a sidewall

of the first via is sloped against the TFT based backplane;

forming the OLED on top of the planarized surface of the planarization layer, the OLED having a top electrode and a bottom electrode and an organic light emitting layer between the top and bottom electrodes, the bottom electrode being formed on the planarized surface, the OLED being vertically integrated with the TFT-based backplane via the planarization layer, the portion of the organic light emitting layer between the top and bottom electrodes at least partially overlapping a gate, source, or drain node of the TFT based backplane, and the first via provides a communication path between the TFT backplane and the OLED, the top electrode being transparent so that light to be emitted by the OLED travels in a direction opposite to the substrate to form a top-emitting OLED; and

forming an additional dielectric layer for covering at least one of the first via and edges of the bottom electrode while leaving the rest of the bottom electrode uncovered.

59.    A detailed recitation of how the Accused Products infringe claim 18 of the '170 Patent is attached as Exhibit 7. For purposes of showing infringement of the '170 Patent, this recitation uses an exemplary BOE OLED display incorporated into the Apple iPhone 16. All other Accused Products share the same or substantially the same architecture recited in claim 18 of the '170 Patent, and therefore infringe in the same way.

60.    BOE directly infringed the '170 Patent under 35 U.S.C. §§ 271(a) and/or 271(g) by making, using, selling, offering to sell, and/or importing into the United States the Accused Products, their components and processes, and/or products that incorporate the fundamental technologies and claims of the '170 Patent. For example, BOE directly infringed the '170 Patent under 35 U.S.C. § 271(g) by offering to sell, selling, importing, and/or using infringing products, their components, and/or products containing same, that were manufactured by a process covered by the '170 Patent. These infringing products, their components, and/or products containing same have not been materially changed by subsequent processes, nor have they become a trivial or nonessential component of another product.

61.    BOE also indirectly infringed the '170 Patent under 35 U.S.C. § 271(b) by inducing third parties, including customers, subsidiaries and wholly or partially owned companies, end users, distributors, and/or retailers, to make, use, sell, offer to sell, and/or import the Accused Products without IGNIS's permission.

62.    BOE has taken active steps, directly and/or through contractual relationships with others, with the specific intent to cause such persons to import, use, sell, and/or offer to sell products containing BOE OLED displays that infringe at least one claim of the '170 Patent. Such steps by BOE include, among other things, making or selling the Accused Products, for importation into or sale in the United States, knowing that such importation or sale would occur. BOE has engaged in these activities with knowledge of the '170 Patent and knowledge that the induced acts constitute infringement.

63.    Third parties, including customers, subsidiaries and wholly or partially owned companies, end users, distributors, and/or retailers, directly infringed the '170 Patent by making, using, selling, offering to sell, and/or importing the Accused Products, including, for example, by manufacturing, configuring, using, selling, and operating the Accused Products.

64.    BOE induced these third parties' direct infringement by advertising, encouraging, instructing, providing support for, and/or operating the Accused Products for or on behalf of such third parties. For example, BOE induced others to import, market, offer to sell, and sell the Accused Products within the United States. BOE also published specifications, datasheets, instruction manuals, support materials, developer materials, marketing materials, and user guide materials that explain, advertise, instruct on, or provide support for the Accused Products.

65.    BOE took the above actions intending to cause infringing acts by these third parties.

66.    If BOE did not know that the actions it encouraged constituted infringement of

the '170 Patent, BOE was willfully blind as to its inducing infringement by others. BOE subjectively believed that there was a high probability that others would infringe the '170 Patent but took deliberate steps to avoid confirming that it was actively inducing infringement by others.

67.    BOE also contributorily infringed the '170 Patent under 35 U.S.C. § 271(c) through its supply of the Accused Products to customers that incorporate them into other products, including the iPhone 16 and other end-user devices. The Accused Products have no substantial non-infringing uses and are especially designed and made for use in devices that infringe the '170 Patent. BOE engaged in these activities despite having notice of the '170 Patent, and the OLED displays that BOE has sold and/or provided to customers embody a material part of the claimed invention of at least one claim of the '170 Patent.

68.    BOE has been on notice of the '170 Patent, at least as early as the filing and service of this Complaint.

69.    BOE had knowledge of the '170 Patent and knew its actions constituted infringement of the '170 Patent, or at least subjectively believed that there was a high probability that the '170 Patent existed and took deliberate actions to avoid learning of the '170 Patent.

70.    BOE's direct and indirect infringement of the '170 Patent is ongoing.

71.    The above-described acts of infringement have caused and continue to cause injury and damage to IGNIS.

72.    BOE's infringement of the '170 Patent has been, and continues to be, willful.

73.    IGNIS is entitled to recover damages sustained as a result of BOE's willful infringement in an amount subject to proof at trial, but in no event less than a reasonable royalty.

## COUNT II: INFRINGEMENT OF THE '946 PATENT

74.    IGNIS incorporates by reference the preceding paragraphs as if fully set forth

herein.

75.    United States Patent No. 8,188,946 ("the '946 Patent"), titled "Compensation Technique for Luminance Degradation in Electro-luminance Devices," was legally and duly issued on May 29, 2012. *See* Exhibit 2.

76.    IGNIS owns all rights, title, and interest in the '946 Patent, and holds all substantial rights pertinent to this suit, including the right to sue and recover for all past, current, and future infringement.

77.    IGNIS has complied with all statutory requirements, including the requirements of 35 U.S.C. § 287, to pursue and recover for any infringement of the '946 Patent.

78.    BOE has infringed literally, and/or under the doctrine of equivalents, at least one claim of the '946 Patent. For example, the Accused Products meet every limitation of at least claim 1 of the '946 Patent. Claim 1 of the '946 Patent recites:

> **1.** A pixel circuit comprising:
>
> a light emitting device;
>
> a storage capacitor having a first terminal and a second terminal;
>
> a first transistor having a gate terminal, a first terminal and a second terminal, the gate terminal being connected to a first select line, the first terminal of the first transistor being connected to a first voltage supply;
>
> a second transistor having a gate terminal, a first terminal and a second terminal, the first terminal of the second transistor being connected to the second terminal of the first transistor, the second terminal of the second transistor being connected to the light emitting device;
>
> a third transistor having a gate terminal, a first terminal and a second terminal, the gate terminal being connected to a second select line, the first terminal being connected to the second terminal of the first transistor, the second terminal being connected to the gate terminal of the second transistor and the first terminal of the storage capacitor;
>
> a fourth transistor having a gate terminal, a first terminal and a second terminal, the gate terminal being connected to a third select line, the first

terminal being connected to the second terminal of the storage capacitor, the second terminal being connected to the second terminal of the second transistor and the light emitting device; and

a fifth transistor having a gate terminal, a first terminal and a second terminal, the gate terminal being connected to the second select line, the first terminal connected to a signal line, the second terminal being connected to the first terminal of the fourth transistor and the second terminal of the storage capacitor.

79.     A detailed recitation of how the Accused Products infringe claim 1 of the '946 Patent is attached as Exhibit 8. For purposes of showing infringement of the '946 Patent, this recitation uses an exemplary BOE OLED display incorporated into the Apple iPhone 16. All other Accused Products share the same or substantially the same architecture recited in claim 1 of the '946 Patent, and therefore infringe in the same way.

80.     BOE directly infringed the '946 Patent under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing into the United States the Accused Products, their components and processes, and/or products that incorporate the fundamental technologies and claims of the '946 Patent. As one example of infringement under 35 U.S.C. § 271(a), BOE sold and made Accused Products outside of the United States, delivered those products to its customers, agents, distributors, and/or subsidiaries in the United States, or delivered the Accused Products outside of the United States intending and/or knowing that those products were destined for the United States and/or designed those products for sale in the United States.

81.     BOE also indirectly infringed the '946 Patent under 35 U.S.C. § 271(b) by inducing third parties, including customers, subsidiaries and wholly or partially owned companies, end users, distributors, and/or retailers, to make, use, sell, offer to sell, and/or import the Accused Products without IGNIS's permission.

82.     BOE has taken active steps, directly and/or through contractual relationships with others, with the specific intent to cause such persons to import, use, sell, and/or offer to sell

products containing BOE OLED displays that infringe at least one claim of the '946 Patent. Such steps by BOE include, among other things, making or selling the Accused Products, for importation into or sale in the United States, knowing that such importation or sale would occur. BOE has engaged in these activities with knowledge of the '946 Patent and knowledge that the induced acts constitute infringement.

83.    Third parties, including customers, subsidiaries and wholly or partially owned companies, end users, distributors, and/or retailers, directly infringed the '946 Patent by making, using, selling, offering to sell, and/or importing the Accused Products, including, for example, by manufacturing, configuring, using, selling, and operating the Accused Products.

84.    BOE induced these third parties' direct infringement by advertising, encouraging, instructing, providing support for, and/or operating the Accused Products for or on behalf of such third parties. For example, BOE induced others to import, market, offer to sell, and sell the Accused Products within the United States. BOE also published specifications, datasheets, instruction manuals, support materials, developer materials, marketing materials, and user guide materials that explain, advertise, instruct on, or provide support for the Accused Products.

85.    BOE took the above actions intending to cause infringing acts by these third parties.

86.    If BOE did not know that the actions it encouraged constituted infringement of the '946 Patent, BOE was willfully blind as to its inducing infringement by others. BOE subjectively believed that there was a high probability that others would infringe the '946 Patent but took deliberate steps to avoid confirming that it was actively inducing infringement by others.

87.    BOE also contributorily infringed the '946 Patent under 35 U.S.C. § 271(c) through its supply of the Accused Products to customers that incorporate them into other products, including the iPhone 16 and other end-user devices. The Accused Products have no substantial

non-infringing uses and are especially designed and made for use in devices that infringe the '946 Patent. BOE engaged in these activities despite having notice of the '946 Patent, and the OLED displays that BOE has sold and/or provided to customers embody a material part of the claimed invention of at least one claim of the '946 Patent.

88.    BOE has been on notice of the '946 Patent, at least as early as the filing and service of this Complaint.

89.    BOE had knowledge of the '946 Patent and knew its actions constituted infringement of the '946 Patent, or at least subjectively believed that there was a high probability that the '946 Patent existed and took deliberate actions to avoid learning of the '946 Patent.

90.    BOE's direct and indirect infringement of the '946 Patent is ongoing.

91.    The above-described acts of infringement have caused and continue to cause injury and damage to IGNIS.

92.    BOE's infringement of the '946 Patent has been, and continues to be, willful.

93.    IGNIS is entitled to recover damages sustained as a result of BOE's willful infringement in an amount subject to proof at trial, but in no event less than a reasonable royalty.

## COUNT III: INFRINGEMENT OF THE '636 PATENT

94.    IGNIS incorporates by reference the preceding paragraphs as if fully set forth herein.

95.    U.S. Patent No. 8,552,636 ("the '636 Patent"), entitled "High Resolution Pixel Architecture" was legally and duly issued on October 8, 2013. *See* Exhibit 3.

96.    IGNIS owns all rights, title, and interest in the '636 Patent, and holds all substantial rights pertinent to this suit, including the right to sue and recover for all past, current, and future infringement.

97.     IGNIS has complied with all statutory requirements, including the requirements of 35 U.S.C. § 287, to pursue and recover for any infringement of the '636 Patent.

98.     BOE has infringed literally, and/or under the doctrine of equivalents, at least one claim of the '636 Patent. For example, the Accused Products meet every limitation of at least claim 1 of the '636 Patent. Claim 1 of the '636 Patent recites:

> **1.**   An integrated circuit for a color pixel having multiple sub-pixels arranged in rows and columns, the circuit comprising:
>
> a first organic light emitting device having front and rear surfaces and emitting light of a first color from the front surface;
>
> a second organic light emitting device having front and rear surfaces and emitting light of a second color from the front surface, the first and second organic light emitting devices located in different rows and columns;
>
> a third organic light emitting device having front and rear surfaces and emitting light of a third color from the front surface, said third organic light emitting device located in the same row as one of said first and second organic light emitting devices, and in the same column as the other of said first and second organic light emitting devices; and
>
> a plurality of drive transistors being located behind the rear surfaces of the first, second and third organic light emitting devices; and
>
> data lines extending across the rear surfaces of the organic light emitting devices.

99.     A detailed recitation of how the Accused Products infringe claim 1 of the '636 Patent is attached as Exhibit 9. For purposes of showing infringement of the '636 Patent, this recitation uses an exemplary BOE OLED display incorporated into the Apple iPhone 16. All other Accused Products share the same or substantially the same architecture recited in claim 1 of the '636 Patent, and therefore infringe in the same way.

100.     BOE directly infringed the '636 Patent under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing into the United States the Accused Products, their

components and processes, and/or products that incorporate the fundamental technologies and claims of the '636 Patent. As one example of infringement under 35 U.S.C. § 271(a), BOE sold and made Accused Products outside of the United States, delivered those products to its customers, agents, distributors, and/or subsidiaries in the United States, or delivered the Accused Products outside of the United States intending and/or knowing that those products were destined for the United States and/or designed those products for sale in the United States.

101.    BOE also indirectly infringed the '636 Patent under 35 U.S.C. § 271(b) by inducing third parties, including customers, subsidiaries and wholly or partially owned companies, end users, distributors, and/or retailers, to make, use, sell, offer to sell, and/or import the Accused Products without IGNIS's permission.

102.    BOE has taken active steps, directly and/or through contractual relationships with others, with the specific intent to cause such persons to import, use, sell, and/or offer to sell products containing BOE OLED displays that infringe at least one claim of the '636 Patent. Such steps by BOE include, among other things, making or selling the Accused Products, for importation into or sale in the United States, knowing that such importation or sale would occur. BOE has engaged in these activities with knowledge of the '636 Patent and knowledge that the induced acts constitute infringement.

103.    Third parties, including customers, subsidiaries and wholly or partially owned companies, end users, distributors, and/or retailers, directly infringed the '636 Patent by making, using, selling, offering to sell, and/or importing the Accused Products, including, for example, by manufacturing, configuring, using, selling, and operating the Accused Products.

104.    BOE induced these third parties' direct infringement by advertising, encouraging, instructing, providing support for, and/or operating the Accused Products for or on behalf of such

third parties. For example, BOE induced others to import, market, offer to sell, and sell the Accused Products within the United States. BOE also published specifications, datasheets, instruction manuals, support materials, developer materials, marketing materials, and user guide materials that explain, advertise, instruct on, or provide support for the Accused Products.

105.    BOE took the above actions intending to cause infringing acts by these third parties.

106.    If BOE did not know that the actions it encouraged constituted infringement of the '636 Patent, BOE was willfully blind as to its inducing infringement by others. BOE subjectively believed that there was a high probability that others would infringe the '636 Patent but took deliberate steps to avoid confirming that it was actively inducing infringement by others.

107.    BOE also contributorily infringed the '636 Patent under 35 U.S.C. § 271(c) through its supply of the Accused Products to customers that incorporate them into other products, including the iPhone 16 and other end-user devices. The Accused Products have no substantial non-infringing uses and are especially designed and made for use in devices that infringe the '636 Patent. BOE engaged in these activities despite having notice of the '636 Patent, and the OLED displays that BOE has sold and/or provided to customers embody a material part of the claimed invention of at least one claim of the '636 Patent.

108.    BOE has been on notice of the '636 Patent, at least as early as the filing and service of this Complaint.

109.    BOE had knowledge of the '636 Patent and knew its actions constituted infringement of the '636 Patent, or at least subjectively believed that there was a high probability that the '636 Patent existed and took deliberate actions to avoid learning of the '636 Patent.

110.    BOE's direct and indirect infringement of the '636 Patent is ongoing.

111.    The above-described acts of infringement have caused and continue to cause injury

and damage to IGNIS.

112.    BOE's infringement of the '636 Patent has been, and continues to be, willful.

113.    IGNIS is entitled to recover damages sustained as a result of BOE's willful infringement in an amount subject to proof at trial, but in no event less than a reasonable royalty.

## COUNT IV: INFRINGEMENT OF THE '257 PATENT

114.    IGNIS incorporates by reference the preceding paragraphs as if fully set forth herein.

115.    U.S. Patent No. 9,867,257 ("the '257 Patent"), entitled "System And Driving Method For Light Emitting Device Display" was legally and duly issued on January 9, 2018. *See* Exhibit 4.

116.    IGNIS owns all rights, title, and interest in the '257 Patent, and holds all substantial rights pertinent to this suit, including the right to sue and recover for all past, current, and future infringement.

117.    IGNIS has complied with all statutory requirements, including the requirements of 35 U.S.C. § 287, to pursue and recover for any infringement of the '257 Patent.

118.    BOE has infringed literally, and/or under the doctrine of equivalents, at least one claim of the '257 Patent. For example, the Accused Products meet every limitation of at least claim 1 of the '257 Patent. Claim 1 of the '257 Patent recites:

> **1.** A pixel circuit comprising:
>
> a light emitting device;
>
> a storage capacitor;
>
> a driving transistor for providing a pixel current to the light emitting device, the driving transistor having a gate terminal, a first terminal connected to the storage capacitor, and
>
> a second terminal connected to the light emitting device;

a first switch transistor electrically connected between a bias line and the first terminal of the driving transistor; and

a second switch transistor electrically connected between a reference voltage line and the gate terminal of the driving transistor; and

an emission control transistor having a gate terminal connected to an emission control line, a first terminal connected to a voltage supply line different from the reference voltage line, and a second terminal connected to the first terminal of the driving transistor.

119. A detailed recitation of how the Accused Products infringe claim 1 of the '257 Patent is attached as Exhibit 10. For purposes of showing infringement of the '257 Patent, this recitation uses an exemplary BOE OLED display incorporated into the Apple iPhone 16. All other Accused Products share the same or substantially the same architecture recited in claim 1 of the '257 Patent, and therefore infringe in the same way.

120. BOE directly infringed the '257 Patent under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing into the United States the Accused Products, their components and processes, and/or products that incorporate the fundamental technologies and claims of the '257 Patent. Furthermore, BOE sold and made Accused Products outside of the United States, delivered those products to its customers, agents, distributors, and/or subsidiaries in the United States, or delivered the Accused Products outside of the United States intending and/or knowing that those products were destined for the United States and/or designed those products for sale in the United States, thereby directly infringing the '257 Patent.

121. BOE also indirectly infringed the '257 Patent under 35 U.S.C. § 271(b) by inducing third parties, including customers, subsidiaries and wholly or partially owned companies, end users, distributors, and/or retailers, to make, use, sell, offer to sell, and/or import the Accused Products without IGNIS's permission.

122. BOE has taken active steps, directly and/or through contractual relationships with

others, with the specific intent to cause such persons to import, use, sell, and/or offer to sell products containing BOE OLED displays that infringe at least one claim of the '257 Patent. Such steps by BOE include, among other things, making or selling the Accused Products, for importation into or sale in the United States, knowing that such importation or sale would occur. BOE has engaged in these activities with knowledge of the '257 Patent and knowledge that the induced acts constitute infringement.

123.    Third parties, including customers, subsidiaries and wholly or partially owned companies, end users, distributors, and/or retailers, directly infringed the '257 Patent by making, using, selling, offering to sell, and/or importing the Accused Products, including, for example, by manufacturing, configuring, using, selling, and operating the Accused Products.

124.    BOE induced these third parties' direct infringement by advertising, encouraging, instructing, providing support for, and/or operating the Accused Products for or on behalf of such third parties. For example, BOE induced others to import, market, offer to sell, and sell the Accused Products within the United States. BOE also published specifications, datasheets, instruction manuals, support materials, developer materials, marketing materials, and user guide materials that explain, advertise, instruct on, or provide support for the Accused Products.

125.    BOE took the above actions intending to cause infringing acts by these third parties.

126.    If BOE did not know that the actions it encouraged constituted infringement of the '257 Patent, BOE was willfully blind as to its inducing infringement by others. BOE subjectively believed that there was a high probability that others would infringe the '257 Patent but took deliberate steps to avoid confirming that it was actively inducing infringement by others.

127.    BOE also contributorily infringed the '257 Patent under 35 U.S.C. § 271(c) through its supply of the Accused Products to customers that incorporate them into other products,

including the iPhone 16 and other end-user devices. The Accused Products have no substantial non-infringing uses and are especially designed and made for use in devices that infringe the '257 Patent. BOE engaged in these activities despite having notice of the '257 Patent, and the OLED displays that BOE has sold and/or provided to customers embody a material part of the claimed invention of at least one claim of the '257 Patent.

128.    BOE has been on notice of the '257 Patent, at least as early as the filing and service of this Complaint.

129.    BOE had knowledge of the '257 Patent and knew its actions constituted infringement of the '257 Patent, or at least subjectively believed that there was a high probability that the '257 Patent existed and took deliberate actions to avoid learning of the '257 Patent.

130.    BOE's direct and indirect infringement of the '257 Patent is ongoing.

131.    The above-described acts of infringement have caused and continue to cause injury and damage to IGNIS.

132.    BOE's infringement of the '257 Patent has been, and continues to be, willful.

133.    IGNIS is entitled to recover damages sustained as a result of BOE's willful infringement in an amount subject to proof at trial, but in no event less than a reasonable royalty.

## COUNT V: INFRINGEMENT OF THE '397 PATENT

134.    IGNIS incorporates by reference the preceding paragraphs as if fully set forth herein.

135.    U.S. Patent No. 10,453,397 ("the '397 Patent"), entitled "Stable Driving Scheme for Active Matrix Displays," was legally and duly issued on October 22, 2019. *See* Exhibit 5.

136.    IGNIS owns all rights, title, and interest in the '397 Patent, and holds all substantial rights pertinent to this suit, including the right to sue and recover for all past, current, and future

infringement.

137.    IGNIS has complied with all statutory requirements, including the requirements of 35 U.S.C. § 287, to pursue and recover for any infringement of the '397 Patent.

138.    BOE has infringed literally, and/or under the doctrine of equivalents, at least one claim of the '397 Patent. For example, the Accused Products meet every limitation of at least claim 11 of the '397 Patent. Claim 11 of the '397 Patent recites:

> **11.**  A display system comprising:
>
> a pixel array having pixel circuits, each pixel circuit including a drive transistor and a light emitting device;
>
> a driver coupled to the pixel circuits and for driving the pixel circuits by repeating an operation cycle defining a frame period for each pixel circuit;
>
> and a controller coupled to the driver, the controller operable to:
>
> select a first pixel circuit during a first operation cycle of a frame period of the first pixel circuit; and
>
> select a second pixel circuit during said selecting the first pixel circuit and during a second operation cycle of a frame period of the second pixel circuit, the first operation cycle different from the second operation cycle.

139.    A detailed recitation of how the Accused Products infringe claim 11 of the '397 Patent is attached as Exhibit 11. For purposes of showing infringement of the '397 Patent, this recitation uses an exemplary BOE OLED display incorporated into the Apple iPhone 16. All other Accused Products share the same or substantially the same architecture recited in claim 11 of the '397 Patent, and therefore infringe in the same way.

140.    BOE directly infringed the '397 Patent under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing into the United States the Accused Products, their components and processes, and/or products that incorporate the fundamental technologies and

claims of the '397 Patent. Furthermore, BOE sold and made Accused Products outside of the United States, delivered those products to its customers, agents, distributors, and/or subsidiaries in the United States, or delivered the Accused Products outside of the United States intending and/or knowing that those products were destined for the United States and/or designed those products for sale in the United States, thereby directly infringing the '397 Patent.

141.    BOE also indirectly infringed the '397 Patent under 35 U.S.C. § 271(b) by inducing third parties, including customers, subsidiaries and wholly or partially owned companies, end users, distributors, and/or retailers, to make, use, sell, offer to sell, and/or import the Accused Products without IGNIS's permission.

142.    BOE has taken active steps, directly and/or through contractual relationships with others, with the specific intent to cause such persons to import, use, sell, and/or offer to sell products containing BOE OLED displays that infringe at least one claim of the '397 Patent. Such steps by BOE include, among other things, making or selling the Accused Products, for importation into or sale in the United States, knowing that such importation or sale would occur. BOE has engaged in these activities with knowledge of the '397 Patent and knowledge that the induced acts constitute infringement.

143.    Third parties, including customers, subsidiaries and wholly or partially owned companies, end users, distributors, and/or retailers, directly infringed the '397 Patent by making, using, selling, offering to sell, and/or importing the Accused Products, including, for example, by manufacturing, configuring, using, selling, and operating the Accused Products.

144.    BOE induced these third parties' direct infringement by advertising, encouraging, instructing, providing support for, and/or operating the Accused Products for or on behalf of such third parties. For example, BOE induced others to import, market, offer to sell, and sell the

Accused Products within the United States. BOE also published specifications, datasheets, instruction manuals, support materials, developer materials, marketing materials, and user guide materials that explain, advertise, instruct on, or provide support for the Accused Products.

145.    BOE took the above actions intending to cause infringing acts by these third parties.

146.    If BOE did not know that the actions it encouraged constituted infringement of the '397 Patent, BOE was willfully blind as to its inducing infringement by others. BOE subjectively believed that there was a high probability that others would infringe the '397 Patent but took deliberate steps to avoid confirming that it was actively inducing infringement by others.

147.    BOE also contributorily infringed the '397 Patent under 35 U.S.C. § 271(c) through its supply of the Accused Products to customers that incorporate them into other products, including the iPhone 16 and other end-user devices. The Accused Products have no substantial non-infringing uses and are especially designed and made for use in devices that infringe the '397 Patent. BOE engaged in these activities despite having notice of the '397 Patent, and the OLED displays that BOE has sold and/or provided to customers embody a material part of the claimed invention of at least one claim of the '397 Patent.

148.    BOE has been on notice of the '397 Patent, at least as early as the filing and service of this Complaint.

149.    BOE had knowledge of the '397 Patent and knew its actions constituted infringement of the '397 Patent, or at least subjectively believed that there was a high probability that the '397 Patent existed and took deliberate actions to avoid learning of the '397 Patent.

150.    BOE's direct and indirect infringement of the '397 Patent is ongoing.

151.    The above-described acts of infringement have caused and continue to cause injury and damage to IGNIS.

152.     BOE's infringement of the '397 Patent has been, and continues to be, willful.

153.     IGNIS is entitled to recover damages sustained as a result of BOE's willful infringement in an amount subject to proof at trial, but in no event less than a reasonable royalty.

## COUNT VI: INFRINGEMENT OF THE '491 PATENT

154.     IGNIS incorporates by reference the preceding paragraphs as if fully set forth herein.

155.     U.S. Patent No. 10,586,491 ("the '491 Patent"), entitled "Pixel Circuits For Mitigation Of Hysteresis," was legally and duly issued on March 10, 2020. *See* Exhibit 6.

156.     IGNIS owns all rights, title, and interest in the '491 Patent, and holds all substantial rights pertinent to this suit, including the right to sue and recover for all past, current, and future infringement.

157.     IGNIS has complied with all statutory requirements, including the requirements of 35 U.S.C. § 287, to pursue and recover for any infringement of the '491 Patent.

158.     BOE has infringed literally, and/or under the doctrine of equivalents, at least one claim of the '491 Patent. For example, the Accused Products meet every limitation of at least claim 1 of the '491 Patent. Claim 1 of the '491 Patent recites:

> **1.**  A display system comprising:
>
> an array of pixel circuits arranged in rows and columns, each pixel circuit including:
>
> a driving transistor;
>
> a storage capacitor coupled across a gate terminal and a first terminal of the driving transistor;
>
> a light emitting device coupled to a second terminal of the driving transistor; and
>
> a reset switch transistor coupled between a first reference potential and a node common to a first terminal of the storage capacitor and the gate

terminal of the driving transistor; and

a controller for driving each pixel circuit during each frame over a plurality of operation cycles for the pixel circuit including a programming cycle for programming the storage capacitor of the pixel circuit, and a reset cycle prior to the programming cycle for resetting the driving transistor of the pixel circuit, the controller resetting the driving transistor of the pixel circuit by activating the reset switch transistor of the pixel circuit during the reset cycle to expose the node of the pixel circuit to the reference potential which causes reverse biasing across the gate and first terminal of the driving transistor.

159.    A detailed recitation of how the Accused Products infringe claim 1 of the '491 Patent is attached as Exhibit 12. For purposes of showing infringement of the '491 Patent, this recitation uses an exemplary BOE OLED display incorporated into the Apple iPhone 16. All other Accused Products share the same or substantially the same architecture recited in claim 1 of the '491 Patent, and therefore infringe in the same way.

160.    BOE directly infringed the '491 Patent under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing into the United States the Accused Products, their components and processes, and/or products that incorporate the fundamental technologies and claims of the '491 Patent. Furthermore, BOE sold and made Accused Products outside of the United States, delivered those products to its customers, agents, distributors, and/or subsidiaries in the United States, or delivered the Accused Products outside of the United States intending and/or knowing that those products were destined for the United States and/or designed those products for sale in the United States, thereby directly infringing the '491 Patent.

161.    BOE also indirectly infringed the '491 Patent under 35 U.S.C. § 271(b) by inducing third parties, including customers, subsidiaries and wholly or partially owned companies, end users, distributors, and/or retailers, to make, use, sell, offer to sell, and/or import the Accused Products without IGNIS's permission.

162.    BOE has taken active steps, directly and/or through contractual relationships with

others, with the specific intent to cause such persons to import, use, sell, and/or offer to sell products containing BOE OLED displays that infringe at least one claim of the '491 Patent. Such steps by BOE include, among other things, making or selling the Accused Products, for importation into or sale in the United States, knowing that such importation or sale would occur. BOE has engaged in these activities with knowledge of the '491 Patent and knowledge that the induced acts constitute infringement.

163.    Third parties, including customers, subsidiaries and wholly or partially owned companies, end users, distributors, and/or retailers, directly infringed the '491 Patent by making, using, selling, offering to sell, and/or importing the Accused Products, including, for example, by manufacturing, configuring, using, selling, and operating the Accused Products.

164.    BOE induced these third parties' direct infringement by advertising, encouraging, instructing, providing support for, and/or operating the Accused Products for or on behalf of such third parties. For example, BOE induced others to import, market, offer to sell, and sell the Accused Products within the United States. BOE also published specifications, datasheets, instruction manuals, support materials, developer materials, marketing materials, and user guide materials that explain, advertise, instruct on, or provide support for the Accused Products.

165.    BOE took the above actions intending to cause infringing acts by these third parties.

166.    If BOE did not know that the actions it encouraged constituted infringement of the '491 Patent, BOE was willfully blind as to its inducing infringement by others. BOE subjectively believed that there was a high probability that others would infringe the '491 Patent but took deliberate steps to avoid confirming that it was actively inducing infringement by others.

167.    BOE also contributorily infringed the '491 Patent under 35 U.S.C. § 271(c) through its supply of the Accused Products to customers that incorporate them into other products,

including the iPhone 16 and other end-user devices. The Accused Products have no substantial non-infringing uses and are especially designed and made for use in devices that infringe the '491 Patent. BOE engaged in these activities despite having notice of the '491 Patent, and the OLED displays that BOE has sold and/or provided to customers embody a material part of the claimed invention of at least one claim of the '491 Patent.

168.    BOE has been on notice of the '491 Patent, at least as early as the filing and service of this Complaint.

169.    BOE had knowledge of the '491 Patent and knew its actions constituted infringement of the '491 Patent, or at least subjectively believed that there was a high probability that the '491 Patent existed and took deliberate actions to avoid learning of the '491 Patent.

170.    BOE's direct and indirect infringement of the '491 Patent is ongoing.

171.    The above-described acts of infringement have caused and continue to cause injury and damage to IGNIS.

172.    BOE's infringement of the '491 Patent has been, and continues to be, willful.

173.    IGNIS is entitled to recover damages sustained as a result of BOE's willful infringement in an amount subject to proof at trial, but in no event less than a reasonable royalty.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff asks this Court for an order granting the following relief:

   a.  a judgment for Plaintiff that BOE has infringed, either literally and/or under the doctrine of equivalents, the Asserted Patents;

b.  all equitable relief the Court deems just and proper as a result of BOE's infringement, including an injunction;

c.  a judgment and order finding that BOE's infringement has been willful and continues to be willful; in the alternative, a judgment and order that BOE's infringement is willful and continues to be willful as of the date of this Complaint;

d.  a judgment and order requiring BOE to pay Plaintiff its damages, costs, expenses, and any enhanced damages to which Plaintiff is entitled for BOE's infringement;

e.  a judgment and order requiring BOE to provide an accounting;

f.  a judgment and order requiring BOE to pay supplemental damages to Plaintiff, including without limitation, pre-judgment and post-judgment interest;

g.  a judgment and order requiring BOE to pay on-going royalties to the extent not enjoined;

h.  a judgment and order finding that this is an exceptional case under 35 U.S.C. § 285 and awarding Plaintiff its reasonable attorneys' fees against BOE; and

i.  any and all other relief as the Court may deem appropriate and just under the circumstances.

Dated: February 11, 2026

Respectfully submitted,

*/s/ Warren J. McCarty, III*

Warren J. McCarty, III
State Bar No. 24107857
wmccarty@azalaw.com
Zach Grinovich
State Bar No. 24149804
zgrinovich@azalaw.com
**AHMAD, ZAVITSANOS & MENSING, PLLC**
2001 Ross Avenue, Suite 520
Dallas, Texas 75201
Telephone: (214) 800-4501

Jason S. McManis
State Bar No. 24088032
jmcmanis@azalaw.com
Louis Liao
State Bar No. 24109471
lliao@azalaw.com
Savannah Ezelle
State Bar No. 24125223
sezelle@azalaw.com
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney Street, Suite 2500
Houston, Texas 77010
Telephone: (713) 655-1101

***Attorneys for Plaintiff IGNIS Innovations Display Panels LLC***